IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KEVIN CHRISTOPHER SCHMIDT, #336431  *

                  Petitioner,             *

     v.                     *    CIVIL ACTION NO. AW-09-752

NANCY ROUSE, et al.,            *

           Respondents.       *
                            ******

**MEMORANDUM**

Pending is Kevin Christopher Schmidt's pro se Petition for Writ of Habeas Corpus (Document 1), the State's response and exhibits (Document 13), and Schmidt's reply (Document 14). The court finds no need for an evidentiary hearing. *See* Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts; *see also* 28 U.S.C. § 2254(e)(2). For reasons stated below, the Court will dismiss the Petition with prejudice, and deny a Certificate of Appealability.

Background

The facts supporting Schmidt's April 13, 2006, guilty plea were summarized by the prosecutor following the plea colloquy:

> On November 23rd of last year the Baltimore County Police became aware of allegations or an incident that had occurred which resulted in the victim in this case, [K.B.], who had just turned 5, being taken first to St. Agnes Hospital and then Franklin Square Hospital where she originally walked in and reported that -- her mother reported that there had been penetration of her vagina by the defendant's penis.
>
> They took her as protocol to Franklin Square Hospital where she was able to receive a thorough examination at that hospital, and Franklin Square Hospital notified the Baltimore County Police after the family got to that location.
>
> At that point, Your Honor, Detective Kuczynski and Monica Boddie,

who is a social worker for the Department of Social Services, they went to
Franklin Square Hospital, and they had an opportunity to speak with [K.B.]
who they found appeared to be obviously consistent with her stated age of five
years old.

She was able to identify, Your Honor, the people who lived in her
home. She was able to identify correctly anatomical parts, body parts on a boy
and girl doll. She labeled all the general parts of the body and named the
private parts as boobies, private parts and butt and penis.

She was asked if she knew why she was at the hospital, and she said,
my Daddy put his penis in my private parts and in my butt and then he peed.
She was asked to name her Daddy because the defendant is not her biological
father. He's her stepfather. She said my Daddy, Kevin, meaning the
defendant, Kevin Schmidt. She was asked if Kevin was the same Daddy that
put his penis in her privates, and she said, yes.

When she was asked then where this took place, whether she was inside
the house, outside or somewhere else when this happened, she said she was in
the house. That she was in the living room when her Daddy came down from
upstairs and picked her up from the couch taking her upstairs, and she had
been watching television.

She said her Daddy took her upstairs to her Mommy and Daddy's room,
and he put her on the bed. She went on to say that her Daddy took her pants
off and put her on the bed with him. He then stood her up and put his penis in
her vagina but that his penis came out of her. She was using the word private
part rather than vagina, but that was the area that she indicated on the drawing
for the social worker.

She said after his penis came out, her daddy put her on her back and put
his penis in her, but she told the social worker that she was very scared, and it
really hurt bad, but she didn't say anything, and that her Daddy didn't say
anything to her either. She was asked if this had happened one time or more
than one time, and [K.B.] at that time was able to say that there was another
time when this had happened in her bedroom on her bed.

She was not able because of her age to be more specific as to the date
or time of that incident. She was asked if anyone was in the house when her
Daddy took her into his own bedroom, which was the incident that had resulted
in her being brought to the hospital, and she said, no. She was asked if
anybody else had touched her in her private parts or had abused her in any
fashion, and she said, no.

She was able -- when asked if she knew what she had on when this
happened, she said she had a blue and white shirt on, and that the sleeves were

just like the ones that she had on, which were long sleeves. That's how she indicated to the social worker as opposed to short sleeves. There were blue letters on the shirt but she didn't know what the words said because she couldn't read. She went on to say that she had on pink underpants as well. She could not remember when she was asked what she was wearing for the incident concerning what had happened in her bedroom.

They went on to ask her if she had ever seen any picture of anybody -- basically, any exposure to pornography on either a computer or in print media, and she said, no. She was asked if anyone had ever taken a picture of her in any fashion when she was not wearing clothes or a picture had been taken during this incident, and she said, no. She told the social worker that she would tell her mother if something like this happened to her again.

Your Honor, based on that information, the police went to the defendant's home. They had an opportunity to speak with him at his home, which for the record is 1149 Granville Road, which is within the confines of Baltimore County. They spoke with him initially about the investigation, and he talked generally about the relationship he had with [K.B.] and her mother and the other children in the family and generally about their marriage and how he felt that [K.B.] was coming between him and his wife, and that his wife tended to favor her over the other children in the family.

He was basically just not being -- he was providing details but not answering the direct questions. Ultimately, the police started to talk to him about the incident that brought them to his house. He first said to the police, Your Honor, that a couple of days ago I was upstairs sleeping, and her Mom wasn't here, but she came into my bedroom and climbed up on the bed. That she climbed over my right shoulder and kept staring at me. She then told me that she loved me and climbed on top of me. She was wearing a short tee shirt and underwear, and I was wearing only a tee shirt and boxers.

I hugged her and she moved on top of me. I was lying on my back on the bed. He then said that the child had straddled him and was doing a grinding motion like in a sexual way. He then told the police he was embarrassed to say that he did get an erection and described his stepdaughter as being loving with him.

He went on to say that [K.B.] had looked down at his shorts and noticed that he had gotten an erection. He said he thought [K.B.] was embarrassed. He told the detectives that his penis popped out of his shorts, and that she got off of him and laid beside him and then said, Daddy, I peed on the bed, and he helped her change her clothes and then went back to watching television.

The detectives, Your Honor, confronted the defendant with some of the things that he said in that statement describing for him, that this child had

3

obviously reacted to him in a very sexual way rather than in a way that they felt was more consistent with a five year's old behavior, and at that point they were interrupted because there was a knock at the door. The defendant was allowed at his request to use the bathroom. He also smoked a cigarette at one point.

He did continue the conversation and said, you're right. It didn't happen like I told you before. I know I should tell you the truth. It happened similar to what I told you but there's more. It happened on a Sunday, last Sunday, which was November 20th, during the daytime. Nobody was home. I was laying in my bed and [K.B.] came into my bedroom. I had on the same clothes that I said earlier. I think she was wearing a shirt and underwear.

At that point they asked him if he went downstairs to get her and if he took her clothing off as the child had said. He said that was not true. He went on to state, again, that she climbed on top of me and did straddle me like I said. I must have gotten an erection just because she was bouncing. He told the detectives he did place the tip of my penis in her vagina, but I didn't want to hurt her.

He was able to say, however, that during the time this was happening that she was kicking her legs around and moving her body from side to side while he was attempting to penetrate her vagina with his penis. He was then asked if he penetrated her buttocks per the rectum with his penis. He denied that allegation. He said, I did take her underwear off. I did ejaculate. My sperm went on her back and went on the bed. I wiped it off with a baby wipe.

At that point, Your Honor, he said that that was the only incident of abuse, and that he never did anything to the child while she was in her bedroom, and he did deny any penetration.

At that point the victim's mother, Laura Schmidt, who was married to the defendant, came home, and the detective asked the defendant if he wanted to tell his wife what he just told them, and he did tell his wife the same version, the second version of what he had disclosed to the police, admitting to his wife that he had penetrated her five year-old daughter's vagina with his penis three days earlier.

Your Honor, the findings -- based on the child's examination at Franklin Square they did find that there were findings consistent with sexual trauma. There were redness and inflammation in her genital area and that her hymen in the doctor's opinion would be consistent with an attempted penetrating injury involving sexual abuse.

Your Honor, if called to testify, [K.B.] and the defendant's wife would tell you that the defendant and the detective would tell you the defendant at

> trial table is the person who was involved in these events as described and who
> admitted to them that he was responsible for placing his penis inside of his five
> year-old's vagina. This occurred within the confines of Baltimore County.
> That would be the statement in support of the plea.

Document 13, Exhibit 2 at 9-17.  Schmidt offered no additions, modifications, or deletions to the

factual statement and the court accepted the plea.  *Id.* at 17.

On June 20, 2006, Schmidt was sentenced to twenty years incarceration with ten years

suspended, followed by five years probation.  Document 13, Exhibit 3 at 39-40.  Although his

limited right to appellate review was explained to him, *id.* at 41, Schmidt did not seek leave to

appeal the entry of his plea.  The judgment of conviction thus became final on July 20, 2006.[1]

On June 15, 2007, Schmidt filed a post-conviction petition in the Circuit Court for

Baltimore County.  Document 13, Exhibit 4.  The petition as supplemented at the hearing and in

a post-hearing memorandum alleged:

(1)     Schmidt had not waived his post-conviction claims by failing
        to seek leave to appeal the guilty plea;

(2)     The guilty plea was defective because he was not advised
        that he was waiving his right against self-incrimination and was
        not advised of the elements of the crime to which he pled guilty; and

(3)     Trial counsel was ineffective for failing to litigate the admissibility
        of his confession.

Document 13, Exhibits 4, 6-8; *see also* Document 1 at 4-A.

Relief was denied in a written decision filed June 9, 2008.  Document 13, Exhibit 8.

Schmidt's application for leave to appeal the post-conviction court's decision was summarily

denied by the Court of Special Appeals of Maryland on March 6, 2009.  The mandate issued on

April 6, 2009.  Id., Exhibits 9 and 10.

Schmidt now raises the following claims in his federal habeas corpus petition:

---

[1] *See* Md. Rule 8-204 (application for leave to appeal to be filed within thirty days of date of judgment from which appeal is sought).

(1)     His confession was involuntary;

(2)     Trial counsel was ineffective for failing to challenge the admissibility of his confession; and

(3)     His guilty plea was invalid because:
    (a)     he was not advised of his privilege against self-incrimination; and
    (b)     he was not informed of the nature of the charge and the consequences of the plea.

Document 1.

## Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), petitioners for federal habeas corpus relief must exhaust each claim in state court. Exhaustion is achieved by seeking review of the claim in the highest available state court. *See* 28 U.S.C. §§ 2254(b)-(c); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996). In Maryland, this may be accomplished by proceeding with certain claims on direct appeal and with other claims by way of a post-conviction petition, followed by petitioning the Court of Special Appeals for leave to appeal. Schmidt no longer has any available state direct review or collateral review remedies available for the claims raised here. His claims will be considered exhausted for this federal habeas corpus review.

## Timeliness

Respondents do not contend - and the record does not show - that Schmidt's petition is time-barred.

## Procedural Default

A claim that has not been presented to the highest available state court by failing to raise it in post-conviction proceedings or on direct appeal or by failing to note a timely appeal, has been procedurally defaulted. *See Coleman v. Thompson*, 501 U. S. 722, 749-50 (failure to note

timely appeal);  *Murray v. Carrier*, 477 U. S. 478 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U. S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief).  Claims which have never been presented or were not exhausted properly in the state courts will not be examined on the merits if review of the claims in state court would be barred by state procedural rules.  *See Johnson v. Maryland*, 915 F.2d 892, 895 (4th Cir. 1990).

The bar is not absolute.  In *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), the Supreme Court held that consideration of a claim in a petition for habeas corpus may be barred by failure to comply with state procedural rules, unless the petitioner makes a showing (1) of cause for the failure and  (2) resulting prejudice.  *See also Murray*, 477 U.S. at 495; *Engle v. Isaac*, 456 U.S. 107, 129 (1982).  If a petitioner cannot show cause and prejudice to excuse procedural default, the habeas court must still consider whether it should reach the merits of the petitioner's claims. In appropriate cases, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.' " *House v. Bell*,  547 U.S. 518, 536 (2006), citing *Murray, supra*, at 495 (quoting *Engle*, *supra*, at 135).  This miscarriage of justice standard is directly linked to innocence.  *Schlup v. Delo*, 513 U.S. 298, 320 (1995).  Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted.  *Id*. at 315.  The miscarriage of justice exception applies when a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*,  477 U. S. at 496.

Respondents argue that Schmidt failed to exhaust his claim that his confession was involuntary.  The Court agrees that Schmidt did not challenge the admissibility of his confession

at trial and did not object to his statements being incorporated into the factual statement that supported his guilty plea.  Document 13, Exhibit 2 at 17.  Schmidt did, however, pursue the claim in post-conviction proceedings in the context of a claim of ineffective assistance of trial counsel (see Ground 2), and it shall be addressed in that context here.  Nothing in the record suggests that Schmidt is innocent.  As to Schmidt's first claim that his confession was involuntary, the claim is procedurally defaulted and will not be examined on the merits here.

Standard of Review

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in our cases."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).[2]  Section 2254(d) also requires federal courts to give great deference to a state court's factual findings.  *See Lenz v. Washington,* 444 F. 3d 295, 299 (4th Cir. 2006).  Section 2254(e)(1)

---

[2]      Although § 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333,  n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curium*), a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor,* 529 at 412-413.  A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court  identifies the correct  governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

of the habeas statute provides that a determination of a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary.   The applicant has the burden of rebutting the presumption of correctness.  A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Ineffective Assistance of Trial Counsel

The right to effective assistance of counsel is protected by the Sixth Amendment. Constitutional ineffective assistance of counsel claims are governed by *Strickland v. Washington,* 466 U.S. 668 (1984).[3] To prevail on a claim of ineffective assistance of counsel, a petitioner must show his attorney's performance fell below an objective standard of reasonableness and that he suffered actual prejudice.  *See Strickland,* 466 U.S. at  687.  To demonstrate actual prejudice, a petitioner must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694.  There exists a strong presumption that counsel's conduct was within a wide range of reasonably professional conduct, and courts must be highly deferential in  scrutinizing counsel's performance. *See  id.* at  688-89. A petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689 (quoting *Michel v. Louisiana*, 350

---

[3]The Court reaffirmed and applied these standards in an ineffective assistance of counsel context in *Bell v. Cone*, 535 U.S.685 (2002):

> For respondent to succeed, however, he must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. [internal citation omitted]. Rather, he must show [the state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Id.* at 698-9.

U.S. 91, 101(1955)).  Furthermore, a determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient. *See id.* at 697. Where, as here, there is a claim of ineffective assistance made in the context of a guilty plea, "in order to satisfy 'the prejudice' requirement the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

At his post-conviction hearing, Schmidt claimed that trial counsel Charles Waechter was ineffective because he did not litigate a challenge to the admissibility of his confession.  The post-conviction court rejected this claim:

> Petitioner alleges that his counsel was ineffective because he failed to litigate the motion to suppress his confession.  This issue has also been waived.  Even if it had not been waived, Mr. Waechter's testimony clearly established that he made a tactical decision, based upon the strength of the evidence, the merits of the motion, and his perception of the assigned motions judge, that it was in his client's best interest to accept the plea that was offered.  He [sic] client made a knowing and voluntary decision to enter a guilty plea, based upon that advice. In fact, Judge Finifter specifically advised the Petitioner that he would be waiving his right to challenge any confessions of statements that were made, and Petitioner acknowledged he was aware of that before he entered his plea. (04/13/08, T. 7-8).  Petitioner is not entitled to post-conviction relief on this issue.

Document 13, Exhibit 8 at 11.  The findings of the post-conviction court are supported by the record.  The trial court specifically informed Schmidt that in pleading guilty, Schmidt was giving up his right to challenge his confession.  Document 13, Exhibit 2 at 7-8.  Trial counsel fully investigated the circumstances of the confession, *id.*, Exhibit 6 at 45, 48-50, and recommended Schmidt take the plea and avoid the potentially greater penalty should he be found guilty after a trial.  *Id.* at 45 and Exhibit 2 at 3-9.  The state court decision reflects a proper application of *Strickland* to the facts of this case and will not be disturbed here.

Defects in the Guilty Plea

To be valid, a guilty plea must be made voluntarily and intelligently, *see Boykin v. Alabama,* 395 U.S. 238, 242 (1969), and with understanding of the potential consequences of the plea.   *See Brady v. United States,* 397 U.S. 742, 755 (1970).   "The longstanding test for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among alternative course of action open to the defendant." *Hill v. Lockhart,* 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970).   The Supreme Court has further held that while the governing  standard as to whether a plea of guilty is voluntary for purposes of the federal Constitution is a question of federal law, and not a question of fact, the historical facts underlying such pleas are entitled to deference under the statute.   *See Sargeant v.  Waters*, 71 F.3d 158, 160 (4th Cir. 1995), quoting *Marshall v. Lonberger,* 459 U.S. 422, 421-32 (1983).   The voluntariness of a plea "can be determined only by considering all of the relevant circumstances surrounding it." The plea is intelligent and knowing where there is nothing to indicate that the defendant is incompetent or otherwise not in control of his mental faculties, is aware of the nature of the charges, and is advised by competent counsel. *See Brady,* 397 U.S. at 756.   The plea must be made with "sufficient awareness of the relevant circumstances and likely consequences." *Id.* at 758.

The post-conviction court considered waived Schmidt's claim that the privilege against compulsory self-incrimination was not explained to him prior to or at his plea hearing. Document 13, Exhibit 8 at 9.   The undersigned agrees that the claim was not raised on direct appeal.   The post-conviction court also examined Schmidt's claim that he was not advised of the elements of the offense:

> Petitioner alleges that his plea was not knowing and voluntary, as he was
> not advised of the elements of the offense to which he pled guilty.  Again,
> this issue is waived by the failure to litigate it on direct appeal.  Even if it
> were not waived, Mr. Waechter was both credible and convincing when he

stated that he reviewed the charges and the elements of the offenses with Petitioner.

The Defense cites *Maryland v. Abrams*, 176 Md. App. 600 (2007) in support of its argument that the plea inquiry is not adequate if the elements of the offense are not explained on the record.  Although *Abrams* does not discuss the minimal requirements that should be included in a guilty plea inquiry to establish that the plea is knowing and voluntary, a specific discussion of the elements of the offense in open court is not required.  In *Abrams*, the petitioner appealed on the grounds that the trial court erred in denying his corum nobis petition because the record of his *Alford* plea contained neither a factual basis in support of the plea nor an adequate explanation for the elements of the crime.  In *Abrams*, the Court of Appeals of Maryland quotes *State v. Priet*, 289 Md. 267, 268-69 (1981), which says that:

> Consistent with the principles espoused in the majority of those state and federal cases, and with the rationale underlying our decision in *Davis*, Rule 731 c does not impose any ritualistic or fixed procedure to guide the trial judge in determining whether a guilty plea is voluntarily and intelligently entered [citation omitted]. Rather, the plea is to be viewed under the "totality of the circumstances as reflected in the entire record."  [Citation omitted].
>
> ***
>
> The rule [731 c] does not require that the precise legal elements comprising the offenses be communicated….Rather, by its express terms, the rule mandates that a guilty plea not be accepted unless it is determined by the court, after questioning of the defendant on the record, that the accused understands the "nature" of the charge.  This, of course, is an essential requirement of the rule and must be applied in a practical and realistic manner.  It simply contemplates that the court will explain to the accused, in under- standable terms, the nature of the offense to afford him a basic understanding of its essential substance, rather than of the specific legal components of the offense to which the plea is tendered. [Citation omitted].

The plea inquiry in this case, particularly when reviewed in light of the testimony from Mr. Waechter that he explained the elements of the offense, was sufficient to establish a knowing and intelligent waiver.  Post conviction relief on this basis has been waived, and even if it had not been waived, it is not warranted.

Document 13, Exhibit 8 at 9-10.     This finding is supported in the record.  At trial, counsel

established that he and Schmidt, who had two years of college, had discussed the indictment, the

charge to which he was pleading guilty, and the maximum penalty for that offense, as well as the rights Schmidt was giving up by entering a guilty plea.  Document 13, Exhibit 2 at 3-9.  A fact statement was read into the record without objection.  *Id.*, Exhibit 2 at 9-17.  At post-conviction, trial counsel testified that as is his consistent practice, he explained the elements of the offenses charged with Schmidt on several occasions, first at an initial meeting, then in anticipation of the motions hearing and during the several weeks of plea negotiations that preceded the motion hearing during which the plea was entered.  Document 13, Exhibit 6 at 46-49.   Nothing more is constitutionally required.  The findings of the state post-conviction court stand.

Certificate of Appealability

A habeas petitioner has no absolute entitlement to appeal a district court's denial of his motion.  *See* 28 U.S.C. § 2253(c) (1). "A [COA] may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at §2253(c) (2). The defendant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke,* 542 U.S. 274, 282, (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484, (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,' " *Miller-El v. Cockrell*, 537 U.S. 322, 335-36, (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983).

The Court will not issue a certificate of appealability because Schmidt has not made the requisite showing.  Denial of a certificate of appealability does not prevent Schmidt from seeking permission to file a successive petition or pursuing his claims upon receipt of that permission.

The Petition is denied and dismissed.  A separate order follows.

Date: <u>January 29, 2010</u>                      _____//s//_____

                                    Alexander Williams, Jr.
                                    United States District Judge